IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Criminal Action No. 13-23-GMS |
| ) | |
| CHRISTOPHER SANCHEZ, ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM**

**I.     INTRODUCTION**

On March 5, 2013, defendant Christopher Sanchez was indicted on the following charges: Conspiracy to Commit a Robbery Affecting Interstate Commerce in violation of 18 U.S.C. §§ 1951(a) and 2; Conspiracy to Possess with Intent to Distribute More Than 5,000 grams of Cocaine in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A), and 846; Possession of a Firearm in Furtherance of a Crime of Violence in violation of 18 U.S.C. § 924(c)(1)(A), (c)(3); and, Possession of a Firearm by a Prohibited Person in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). (D.I. 19.) The charges stem from a government created reverse sting operation in which Sanchez and his codefendants conspired with a government informant and with each other to invade a house and steal drugs. But there was no house and there were no drugs. On July 5, 2013, Sanchez filed a Motion to Dismiss the Indictment based upon outrageous government conduct. (D.I. 29.) For the reasons that follow, the court will deny the motion.

**II.    BACKGROUND**

In April of 2012, the Bureau of Alcohol, Tobacco, and Firearms, ("ATF") began a series

of investigations of members of drug trafficking groups and criminal gangs. (D.I. 1 at ¶ 11.) As part of the investigation, the ATF engaged the assistance of a particular cooperating witness (the "CI") to assist in finding home-invasion crews throughout Delaware. (*Id.*) On July 26, 2012, the CI used funds provided by the ATF to purchase a firearm from Angel Arbolay, a man known to law enforcement to be a gun and cocaine supplier. (*Id.* at ¶ 12.) The CI subsequently indicated to Arbolay that there may be a future opportunity for Arbolay to commit a robbery of a drug stash house. (*Id.* at ¶ 14.) On August 22, 2012, Arbolay invited the CI to his house and asked the CI for more details regarding the potential drug stash house robbery. Later that day, Arbolay introduced the CI to Sanchez. (*Id.*) According to the CI, both Arbolay and Sanchez expressed interest in robbing a drug stash house, and Sanchez provided his cellular telephone number to the CI for future contact. (*Id.* at ¶ 15.)

On September 2, 2012, the CI had an additional meeting with Arbolay. Arbolay confirmed that he was willing to commit the drug stash house robbery and also claimed that Sanchez wanted to participate as well. (*Id.* at ¶ 16.) Three days later, the CI introduced an ATF Undercover Agent ("UC") to Arbolay and Sanchez. (*Id.* at ¶ 17.) The UC posed as a drug courier who was disgruntled because the Mexican group he worked for was "cheating him out of his money." The UC stated he wanted to commit a robbery at the location where they stashed the cocaine, and that there would be at least twenty (20) kilograms of cocaine in the house. The UC further stated that out of the twenty (20) kilograms, he wanted just five (5) kilograms, and the rest of the cocaine was theirs. (*Id.* at ¶ 18.)

The UC indicated that there were always two individuals guarding the stash house, and one of them would be armed. The UC stated he was scared of the people he worked for. Sanchez

told him not to worry because they had done plenty of things like this before. Sanchez then asked where the stash house was located, and the UC stated that it was always a different location and he never knew until they called him. (*Id.* at ¶ 19.) The UC told Arbolay and Sanchez that the next load of cocaine would be arriving the following week. (*Id.* at ¶ 20.)

The UC met with Arbolay on September 6 and September 10, 2012, to discuss the robbery. (*Id.* at ¶¶ 21-31.) At both meetings, Arbolay confirmed that he and "his guys" were still interested in committing the robbery, and that they had done something similar in the past. Arbolay also gave details about how they would conduct the robbery, (*id.* at ¶ 22, 25, 30), and that "he and others were going to buy a [handgun] for $150.00," (*id.* at ¶ 26). At the September 6 meeting, the UC gave Arbolay a prepaid cellular phone. (*Id.* at ¶ 23.) At the September 10 meeting, the UC stated he would get Arbolay a car for the robbery. (*Id.* at ¶ 26.) Arbolay then asked the UC for money to buy masks and gloves, to which the UC replied that he was "short on money, but would ask his wife if she had any money." (*Id.* at 27.) At the end of the meeting, Arbolay again requested money, and the UC responded by giving Arbolay $25.00 and "told him to use it for gas or for minutes for the phone." (*Id.* at 31.) Sanchez did not attend either meeting. (*Id.* at ¶¶ 21-23, 30.)

On September 12, 2012, the first home invasion robbery ruse was canceled after the suspects failed to bring any firearms. (*Id.* at 32.) The CI picked up Arbolay, and then drove to a residence where they met Sanchez. After they found out that Arbolay did not have any guns for the anticipated robbery, "Sanchez drove off in an attempt to obtain their firearms through their connections." (*Id.* at ¶ 33.) Arbolay called the UC and said that Sanchez had found two guns, but the group did not have enough cash to purchase them, and relayed Sanchez's suggestion that the

3

group use pepper spray for the drug stash house robbery. The UC replied "that's not like a good chance." (*Id.* at ¶ 34.)

On September 18, 2012, the UC spoke with Sanchez over the phone. Sanchez stated that "he, not Arbolay, was the one doing all the work and that he now had everything ready." (*Id.* at ¶ 37.) Later that same day, the UC met Sanchez in person and asked him what had happened the week before. Sanchez replied that he was the guy with the guns; that he had sold one gun to make enough money to buy two other guns, but that deal fell through; and that he now had all the artillery that he needed. Sanchez then discussed details about the armed robbery plan including where the guard's gun was located and how the UC got inside the house. (*Id.* at ¶ 38.) Sanchez also asked the UC if three guns would be enough for the robbery. The UC replied that he did not know, and that Sanchez and the others were the ones that had handled similar robberies in the past. (*Id.* at ¶ 39.)

The following day, September 19, the UC called Sanchez and told him that they needed to meet pretty quickly because the UC could get a phone call at any time. (*Id.* at ¶ 40.) Approximately one hour later, the CI arrived with Sanchez in the front seat and two male rear seat passengers (later identified to be codefendants Charles and Donte Banks). The UC asked if "they were good and had everything they needed." Sanchez answered yes. (*Id.* at ¶ 42.) The Banks brothers asked the UC some questions about the drug stash house and told the UC details of their armed robbery plan. (*Id.* at ¶¶ 45-47.) The UC then asked Sanchez if they had the guns and Sanchez replied that the guns were there. (*Id.* at ¶ 46.) Sanchez and the Banks brothers were asked one last time if they were ready. They responded that they were ready. At that point, all three men were arrested and taken into custody. A subsequent searched resulted in the seizure of

4

three guns, a container of pepper spray, and a large duffel bag. (*Id.* at ¶¶ 48-49.)

## III. APPLICABLE LAW

If the Government's conduct in an investigation is "'so outrageous' as to be 'shocking to the universal sense of justice,' then the Due Process Clause can function as an 'absolut[e] bar [on] the [G]overnment from invoking judicial processes to obtain a conviction.'" *United States v. Lakhani*, 480 F.3d 171, 177-78 (3d Cir. 2007) (alteration in original) (quoting *United States v. Russell*, 411 U.S. 423, 431-32, 93 S. Ct. 1637, 36 L. Ed. 2d 366 (1973)). To meet that standard, the Third Circuit has stated that "the challenged conduct must be shocking, outrageous, and clearly intolerable . . . . The cases make it clear that this is an extraordinary defense reserved for only for the most egregious circumstances." *United States v. Nolan-Cooper*, 155 F.3d 221, 230-31 (3d Cir. 1998) (alteration in original) (quoting *United States v. Mosley*, 965 F.2d 906, 910 (10th Cir. 1992)). The Third Circuit has repeatedly noted it is "'extremely hesitant to find law enforcement conduct so offensive that it violates the Due Process Clause.'" *United States v. Hoffecker*, 530 F.3d 137, 154 (3d Cir. 2008) (quoting *United States v. Voigt*, 89 F.3d 1050, 1065 (3d Cir. 1996)). Accordingly, while the outrageous government conduct defense is "often invoked by defendants, [it] is rarely applied by courts."[1] *Voigt*, 89 F.3d at 1065 (citing *United States v. Santana*, 6 F.3d 1, 4 (1st Cir. 1993) ("The banner of outrageous misconduct is often raised but seldom saluted.")).

## IV. DISCUSSION

Sanchez states that he became involved in the drug stash house robbery solely as a

---

[1] Indeed, the Third Circuit has recognized that "the viability of the [outrageous government conduct] doctrine is hanging by a thread," and that "courts have rejected its application with almost monotonous regularity." *Nolan-Cooper*, 155 F.3d at 230 (citations omitted).

product of the overbearing and outrageous conduct of government agents (the CI and UC), who pressured him to agree to assist in the commission of a crime that he would have not otherwise committed. (D.I. 30 at 12.) Sanchez contends that the government agents' outrageous conduct "in planning, paying for, and facilitating an armed robbery that never was to happen constitute[s] a clear violation of the Due Process Clause" and mandates a dismissal of the Indictment in this case. (*Id.* at 13.) The court disagrees.

Sanchez argues that the facts of this case are "somewhat analogous" to those in *United States v. Twigg*, 588 F.2d 373 (3rd Cir. 1978) -- the only case in which the Third Circuit has found the Government's conduct was so outrageous that it offended due process. In *Twigg*, a government informant, at the request of the DEA, contacted one of the defendants, Henry Neville, to propose setting up a methamphetamine laboratory. 588 F.2d at 375. Neville expressed an interest and over several months arrangements were made. William Twigg later became involved in the operation to repay a debt to Neville. The record revealed that "Neville assumed primary responsibility for raising capital and arranging for distribution" of the drugs, "while [the informant] undertook the acquisition of the necessary equipment, raw materials, and a production site." *Id.* The DEA greatly assisted the informant with his end of the operation by providing glassware and an essential chemical, which was the most difficult ingredient to obtain, and renting a farmhouse in which to set up the laboratory. The DEA also facilitated the informant's purchase of the remaining equipment. *Id.* at 375-76. Once set up, "[the informant] was completely in charge and furnished all of the laboratory expertise." *Id.* at 380-81. Further, neither defendant had the know-how to manufacture methamphetamine, and "[t]he assistance they provided was minimal and [] at the specific direction of [the informant]." *Id.* at 381. In sum,

6

the Third Circuit dismissed the indictment because the Government agents set up the defendants, "encouraged [them], provided the essential supplies and technical expertise, and when [the defendants] and [the informant] encountered difficulties in consummating the crime, [the government agents] assisted in finding solutions." *Id.*

Sanchez specifically identifies the following similarities between his case and *Twigg*: the illicit plan did not originate with the defendants; the UC "provid[ed] supplies such as a prepaid cell phone and money and even offer[ed] to provide a car for Arbolay"; and the UC constantly emphasized that firearms required to commit the robbery -- especially when Sanchez proposed using pepper spray instead of guns. Thus, Sanchez argues "[i]n essence, the subject crime was manufactured and directed by the government." (D.I. 30 at 14.)

The court only agrees that here, as in *Twigg*, a Government agent suggested the criminal activity. But there the similarities end. The record does not establish that the Government agents' conduct approached the rigorous Third Circuit standards -- "shocking, outrageous, and clearly intolerable" -- that would be necessary for Sanchez's motion to prevail. *See Nolan-Cooper*, 155 F.3d at 230. Indeed, the Government's further involvement in the present criminal scheme was minimal. Although the UC provided Arbolay a cellphone and a nominal amount of money, the court finds that conduct is not equivalent to the Government agents' purchase of "essential" supplies in *Twigg*.[2]

Further distinguishing *Twigg*, the Government agents in this case were not "completely in charge" and did not "furnish[] all of the [relevant] expertise" to execute a home invasion. *See*

---

[2] The court notes that Sanchez provided the government agents with his own cellphone number, (D.I. 1 at ¶ 15), and directly contacted the UC regarding the robbery, (*Id.* at ¶ 37). Also, while Arbolay asked the UC for money "to buy masks and gloves," (*Id.* at ¶ 27), the record does not reflect that any of those items were recovered when the defendants were arrested, (*Id.* at ¶ 49).

7

588 F.2d at 380-81. Moreover, Sanchez's role in the criminal scheme was not "minimal" or "at the specific direction of [the Government agents]." *Id.* at 381. Rather, Sanchez and his coconspirators used their own knowledge to organize and plan the drug stash house robbery. Sanchez asked where the stash house was located and told the UC he had "done plenty of things like [the stash house robbery] before." (D.I. 1 at ¶ 19.) He attempted to obtain firearms for use during the robbery when Arbolay failed to produce the gun as planned. (*Id.* at ¶ 33.) Sanchez told the UC that "he, not Arbolay, was the one doing all the work and that he now had everything ready." (*Id.* at ¶ 37.) Sanchez also explained that the reason they were not able to go through with the robbery on the original date was because *his* deal to purchase two guns for the robbery fell through.[3] He also discussed details of the armed robbery plan with the UC, including the location of the armed guards, the amount of cocaine, and the number of guns needed to overtake the men guarding stash house. (*Id.* at ¶ 38.) Finally, Sanchez recruited two new members to the conspiracy. (*Id.* at ¶ 44-48.)

Considering the applicable law and the facts of the present case, the court finds that the Government agents' conduct does not rise to the level of a due process violation.

## V. CONCLUSION

For the reasons stated above, the court will deny the defendant's Motion to Dismiss the Indictment. (D.I. 29.)

Dated: September 30, 2013

CHIEF, UNITED STATES DISTRICT JUDGE

---

[3] Here again, the court notes the facts are distinguishable from *Twigg*, where the DEA "provid[ed] an isolated farmhouse well-suited for the location of an illegally operated laboratory," when the defendants encountered a problem locating an adequate methamphetamine production site. 588 F.2d at 380.

8

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

UNITED STATES OF AMERICA, )
 )
Plaintiff, )
 )
v. ) Criminal Action No. 13-23-GMS
 )
CHRISTOPHER SANCHEZ, )
 )
Defendant. )

**ORDER**

At Wilmington, this 30th day of September, 2013, consistent with the Memorandum issued this same date, IT IS HEREBY ORDERED THAT:

Defendant's Motion to Dismiss the Indictment is DENIED.

_____
CHIEF, UNITED STATES DISTRICT JUDGE